**2018 UT App 238**

# THE UTAH COURT OF APPEALS

DANIELLE MARIE HARTVIGSEN,
Appellant,
*v.*
RICHARD MYERS HARTVIGSEN,
Appellee.

Opinion
No. 20160069-CA
Filed December 28, 2018

Fourth District Court, Provo Department
The Honorable Lynn W. Davis
No. 064402132

Danielle Marie Hartvigsen, Appellant Pro Se[1]

Richard Myers Hartvigsen, Appellee Pro Se

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion, in which JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 This is an appeal from a district court's division of property and award of alimony in the aftermath of a contentious divorce between Danielle Marie Hartvigsen and Richard Myers Hartvigsen.[2] Danielle contends that the court abused its discretion when it imputed income to her, declined to accept her claimed expenses at face value, and credited Richard's

---

1. Assisted by Leslie W. Slaugh.

2. As is our practice in cases where both parties share a last name, we refer to the parties by their first names with no disrespect intended by the apparent informality.

unrebutted testimony about his intent to convey real property to himself and Danielle as joint tenants. Danielle also contends that she was denied due process. We affirm.

## BACKGROUND

¶2     Danielle and Richard married in 1995 and separated in 2005. Danielle filed for divorce in 2006, and in 2007 the district court entered a bifurcated decree of divorce, granting the divorce but reserving all other issues for later decision. After extensive litigation, a trial was held in 2012, and a supplemental decree of divorce was entered awarding Danielle a total property award of more than $1 million and alimony of $1,000 per month. Danielle filed several post-trial motions, including a motion for new trial which were denied in December 2015. Danielle appeals.

## ISSUES AND STANDARDS OF REVIEW

¶3     Danielle first argues that the district court's alimony award was insufficient because the court exceeded its discretion by imputing income to her and in assessing her needs. We "review a district court's alimony determination for an abuse of discretion" and will not disturb its alimony ruling "as long as the court exercises its discretion within the bounds and under the standards [set by Utah appellate courts] and has supported its decision with adequate findings and conclusions." *Dahl v. Dahl*, 2015 UT 79, ¶ 84 (quotation simplified).

¶4     Danielle next argues that because Richard transferred a home that he purchased before marriage to the couple as joint tenants, the district court erred in determining that the home should be considered Richard's separate property. "Generally, district courts have considerable discretion concerning property

distribution in a divorce proceeding and their determinations enjoy a presumption of validity." *Id.* ¶ 119 (quotation simplified). Accordingly, we will reverse only when "a clear and prejudicial abuse of discretion is demonstrated." *Id.* (quotation simplified). In reviewing the district court's decision, "we will not set aside findings of fact, whether based on oral or documentary evidence, unless they are clearly erroneous, and we give due regard to the district court's superior position from which to judge the credibility of witnesses." *Id.* ¶ 121.

¶5 Finally, Danielle asserts that the district court erred in refusing to grant her motion for new trial because misstatements by Richard in the pretrial phase precluded her from obtaining funds necessary to hire an attorney and resulted in a denial of due process. "Generally, we afford trial judges wide latitude in granting or denying rule 59 motions . . . . Consequently, we generally disturb a trial court's grant or denial of a rule 59 motion only if it constitutes an abuse of discretion." *Sanpete Am., LLC v. Willardsen*, 2011 UT 48, ¶ 28, 269 P.3d 118. Furthermore, we will not reverse a denial of a motion for new trial unless the appellant can demonstrate a reasonable likelihood that the outcome would have been different in the absence of the alleged error. *See Pullham v. Kirsling*, 2018 UT App 65, ¶ 38, 427 P.3d 261.

ANALYSIS

I. Alimony

¶6 Danielle first asserts that the district court's alimony award should be reversed because the court abused its discretion in imputing income to her and in calculating her needs.[3]

---

3. Danielle also challenges the court's calculation of Richard's income. Specifically, she claims that the court should have

(continued…)

However, in light of the supporting evidence and the district court's articulated findings, Danielle's various arguments fail to convince us that the court abused its discretion.

## A.    Imputation of Income

¶7    Danielle first contends that "imputing income to [her] as a practicing attorney was an abuse of discretion" because she "had not worked as an attorney for nearly 19 years" and because "there was no competent evidence that a person with her experience could obtain employment as an attorney."

¶8    In calculating an alimony award, a court must consider, among other things, the recipient's ability to produce income. *See* Utah Code Ann. § 30-3-5(8)(a)(ii) (LexisNexis Supp. 2010)[4]. When an individual "has no recent work history or [his or her] occupation is unknown, income shall be imputed at least at the federal minimum wage for a 40–hour work week." *See id.* § 78B-12-203(7)(c) (LexisNexis 2012). The court may impute greater income upon entering "specific findings of fact as to the evidentiary basis for the imputation." *Id.* (governing the

_____

(…continued)
considered Richard's W-2 for 2004. Danielle has not demonstrated that this argument was preserved. *See* Utah R. App. P. 24(a)(5). In fact, it does not appear that the disputed W-2 was admitted into evidence by the district court; we have not been able to locate the W-2 in the record on appeal, and Danielle does not provide a record citation to where the W-2 may be found. We therefore do not address this claim further. *See id.* R. 24(a)(8); *id.* R. 24(a)(12)(C); *id.* R. 24(e).

4. Because the language of some statutes have changed, we cite to the version of the statutes in effect at the time of trial.

imputation of income for child support purposes).[5] Such imputation "shall be based upon employment potential and probable earnings as derived from employment opportunities, work history, occupation qualifications, and prevailing earnings for persons of similar backgrounds in the community, or the median earning for persons in the same occupation in the same geographical area as found in the statistics maintained by the Bureau of Labor Statistics." *Id.* § 78B-12-203(7)(b).

¶9    The court heard extensive evidence related to Danielle's ability to produce income, including her education and the range of potential salaries for individuals with similar educational achievements. Danielle earned a juris doctor from Stanford Law School in 1988 and a master's degree in wildlife biology from Brigham Young University in 1996. She received scholarships for both her legal and wildlife biology education. Danielle was admitted to the Utah State Bar in 1990 and worked at two law firms immediately after that. Her employment at the later firm was terminated in 1993.

¶10    A vocational expert retained by Richard testified that there were "260 annual openings for attorneys in the state of Utah metro area"[6] and that the entry-level annual salary for an attorney in the Provo/Orem area at the time of trial was between $61,318.40 and $70,886.40. The expert did not know how many applicants there were for the 260 attorney positions but admitted that the competition was "keen." The expert also testified that

5. "Although this section of the Utah Code addresses imputation for the purposes of child support, it is also relevant to imputation in the alimony context." *Fish v. Fish*, 2010 UT App 292, ¶ 14 n.5, 242 P.3d 787.

6. The expert explained that the term "state of Utah metro area" referred to the region between Provo and Ogden.

the entry-level annual salary for a wildlife biologist began at $40,788.80. Danielle did not present any contrary expert testimony.

¶11 The court ultimately imputed $50,000 in annual income to Danielle, identifying this sum as an "average" based on the vocational evaluator's testimony that Danielle could earn between $40,788.80 and $70,886.40. The court also made several findings about Danielle's ability to work as an attorney. For example, it found that Danielle's "lack of success as a lawyer was due to her failure to keep up with billable hours" but that "[t]his does not mean [she] is incapable of employment in a law job." The court pointed to evidence of Danielle's demonstrated negotiating and organizational capabilities, finding that her "testimony about her inability to be employed is not credible and she is fully employable." The court also noted the half-hearted efforts Danielle made to seek assistance from the Utah Department of Rehabilitation and to pursue mediation training and employment, ultimately finding that her "efforts to become self-sufficient have been inadequate."

¶12 On appeal, Danielle raises several objections to the district court's income imputation, namely that the vocational expert's testimony failed to establish that she could obtain employment as an attorney, that the court erred in concluding that her efforts to obtain employment had been inadequate, and that the court failed to judge her ability to earn against "persons of similar backgrounds in the community." *See id.* § 78B-12-203(7)(b).

¶13 Danielle first argues that "[t]here was no competent evidence that [she] could obtain employment as an attorney," because "there was no evidence concerning the number of qualified applicants" for the available positions. She concedes that the vocational expert testified that there were "260 annual openings for attorneys" but highlights the expert's admission that he did not know how many applicants there were for those

jobs. She suggests that in the absence of evidence of the number of applicants, the evidence of the existence of job openings was insufficient to support the court's findings.

¶14  Danielle cites no authority supporting this proposition. Nor does this argument seem reasonable on these facts. Imputation, by definition, contemplates a degree of speculation. Indeed, the statute allows courts to impute income "based upon employment *potential* and *probable* earnings." *See id.* § 78B-12-203(7)(b) (emphases added). And "[n]either the statute nor any case law of which we are aware requires trial witnesses to identify a position with a specific employer that meets a spouse's employment needs." *Bond v. Bond*, 2018 UT App 38, ¶ 11, 420 P.3d 53.

¶15  Perhaps more importantly, Danielle did not present any evidence that the number of applicants overwhelmed the number of available jobs such that she had no reasonable likelihood of securing employment as an attorney.[7] Thus, the only affirmative evidence before the court was that there were 260 job openings for lawyers in the Utah metro area each year and that "the entry level wage for an attorney" in the area was between $61,318.40 and $70,886.40. While the expert noted that the job market was tight, there was no evidence suggesting that

---

7. Danielle cites one case for the proposition that, when determining "a recipient's 'income and resources,' [the government] must ensure that any such income or resources 'actually exist,' be not 'fictitious' or 'imputed,' and 'be actually on hand or ready for use when it is needed.'" *See Heckler v. Turner*, 470 U.S. 184, 200 (1985). But that case concerned public assistance from the government, not alimony. Moreover, the quoted language was describing a Social Security Board "policy statement applicable to various aid programs" and was not a legal holding by the Court. *Id.*

the odds of Danielle securing one of the 260 jobs were so low as to make her ability to earn the imputed income improbable. We think the unrebutted evidence before the district court was sufficient to support the finding that, in light of her education, Danielle could reasonably be expected to earn $50,000 annually as an attorney. *See Dahl v. Dahl*, 2015 UT 79, ¶ 121 (noting that it is the province of the fact finder to weigh competing evidence and that "we will not set aside findings of fact . . . unless they are clearly erroneous").

¶16 Danielle also challenges the court's finding that her efforts to obtain employment were inadequate. Although not required to impute income, a finding of "voluntary unemployment or underemployment may be relevant when considering whether a party is concealing income or shirking in his or her efforts to earn income." *Reller v. Argenziano*, 2015 UT App 241, ¶ 33, 360 P.3d 768 (quotation simplified). Danielle asserts that she was not voluntarily or willfully unemployed because she had applied for jobs in 1993 but had been unsuccessful in finding employment as an attorney.

¶17 According to Danielle, the court's analysis should be limited to considering what she did "immediately after termination, not 19 years later." However, she again does not provide any authority to support this proposition. Danielle asserts that she "applied for 2 jobs per week for up to a year after she was fired in January of 1993." But her inability to secure employment as an attorney in 1993 is not dispositive of her ability to do so nineteen years later. Danielle's termination and unsuccessful job search nearly two decades before the court's ruling simply do not demonstrate clear error in the finding that she "has made no credible efforts to become employed or self-sufficient in the seven years since the parties' separation."

¶18 Danielle also argues that it was unreasonable for the court to determine that she could find work as an attorney when she

had not worked as an attorney for the past nineteen years. In support of this assertion, she cites *Spencer v. Utah State Bar*, 2012 UT 92, 293 P.3d 360, in which the Utah Supreme Court enforced the Utah State Bar's requirement that an out-of-state applicant to the Utah Bar have practiced for three out of the preceding five years in order to be admitted without taking the Utah bar examination. *See id.* ¶¶ 16–18. Danielle argues that like the attorney in *Spencer*, she does not satisfy the three-out-of-the-last-five years rule and therefore is incapable of finding employment as an attorney in Utah. But that rule applied to out-of-state attorneys who wished to practice in Utah without taking and passing the Utah bar examination. *See id.* ¶¶ 9–13. In contrast, Danielle *did* take and pass the Utah bar examination. And there is no rule preventing attorneys who have passed that examination from activating their licenses and practicing law simply because they have not practiced law recently. Indeed, the absence of a rule to that effect suggests the opposite; it appears that in the view of the Utah State Bar, attorneys are presumptively competent to practice law in Utah, even if they have not practiced law recently, so long as they have passed the Utah bar examination and are eligible to be licensed.

¶19  Finally, Danielle argues that the court "did not properly apply [the] legal standard" for imputation of income because it failed to consider "prevailing earnings for persons of similar background in the community." *See* Utah Code Ann. § 78B-12-203(7)(b). Danielle asserts that the "similar background" requirement means that the court should have considered only the prevailing earnings of "attorney[s] who had been fired from their only law jobs, had not been able to find a job while applying for 2 per week for a year [after termination,] and hadn't worked in that occupation for over 19 years." Danielle provides no reasoned analysis to support her assertion.

¶20  It is a well-recognized canon of statutory interpretation that "we presume that the legislature used each word

advisedly." *Bylsma v. R.C. Willey*, 2017 UT 85, ¶ 64 n.115, 416 P.3d 595 (quotation simplified). Here, the legislature employed the term "similar" rather than "identical" or "same." We presume that this choice reflects the legislature's intent not to limit a consideration of prevailing earnings to individuals with identical backgrounds. We therefore see no error in the district court's consideration of the prevailing earnings of "persons of similar background" as opposed to "persons of identical background." *See* Utah Code Ann. § 78B-12-203(7)(b).

¶21 Further, Danielle fails to acknowledge the ways in which the district court did take her background into account and even demonstrated leniency in its imputation. Although Danielle had several years of work experience as an attorney—albeit dated experience—the court based its imputation on salaries for *entry-level* attorneys. And even then, the court imputed only $50,000 of annual income to Danielle, more than $10,000 less than the low end of the vocational expert's estimate of attorney salaries. Thus, Danielle's assertion that the court failed to assess her potential income based on others of similar backgrounds is not supported by the record.

¶22 In short, none of the objections Danielle raises demonstrate that the district court exceeded its discretion in imputing income to her.

B.     Determination of Need

¶23 Danielle next contends that the district court abused its discretion in determining the amount of her needs. In calculating an alimony award, courts are required to consider, among other things, "the financial condition and needs of the recipient spouse." Utah Code Ann. § 30-3-5(8)(a)(i) (LexisNexis Supp. 2010). Generally, courts are expected to assess need based on the standard of living existing at the time of the parties' separation. *See id.* § 30-3-5(8)(c).

¶24 In evaluating Danielle's needs, the court found that her "monthly needs . . . are overstated and bear no relation to her historical needs or standard of living as of the date of separation" and that her "claimed need exceeds [Richard]'s take-home income earned during the parties' marriage." The court called out a number of expenses that it considered to be overstated. It also found that Danielle's "testimony regarding finances and expenses is not credible," that "[s]he failed to provide any credible evidence regarding expenses," and that her evidence contradicted itself. The court contrasted this with Richard's testimony regarding the marital standard of living, which it deemed to be "credible, detailed and specific."

¶25 We defer to the factfinder's advantaged position to weigh conflicting evidence and testimony, and we will not set aside findings of fact so long as evidence supports them. *See Dahl v. Dahl*, 2015 UT 79, ¶ 121; *Bonnie & Hyde, Inc. v. Lynch*, 2013 UT App 153, ¶ 18, 305 P.3d 196. Danielle's evidence of her financial needs was largely limited to her testimony and was generally unsupported by documentation. Yet, rather than address the district court's credibility determination, on which its assessment of her needs largely rested, Danielle asks us to reconsider the reasonableness of her expenses. We decline to do so, because she has failed to demonstrate that the district court exceeded its discretion in its credibility determination, or even to address that determination. Moreover, in fashioning an alimony award, Danielle fails to address the district court's consideration of the extensive support Richard provided Danielle from the date of the parties' separation to the trial, the large property settlement Danielle received in the divorce, and the court's finding that Danielle wrongly diverted marital funds from the parties' joint accounts at the time of their separation.

¶26 Because the district court did not exceed its discretion in imputing income to Danielle and in calculating her need, we decline to disturb its alimony award.

## II. Richard's Intent and Presumption of Gift

¶27 Danielle next contends that the district court erred by ruling that certain real property, owned solely by Richard before the marriage, remained his individual property despite being subsequently conveyed to Richard and Danielle as joint tenants. While a "transfer of otherwise separate property to a joint tenancy with the grantor's spouse is generally presumed to be a gift," *Bradford v. Bradford*, 1999 UT App 373, ¶ 22, 993 P.2d 887, it "is not conclusive [evidence] that a gift has been made." *Jesperson v. Jesperson*, 610 P.2d 326, 328 (Utah 1980). Generally, the gift must be "coupled with an evident intent to do so [to] effectively change[] the nature of that property to marital property." *Bradford*, 1999 UT App 373, ¶ 22. And "[t]he trial judge has wide discretion in the division of marital property (a matter of equity) and [the court's] findings will not be disturbed unless the record shows there has been an abuse of discretion." *Jesperson*, 610 P.2d at 328.

¶28 The two cases cited above are illustrative of the central role intent plays in dividing marital property. In *Jesperson*, the district court found that despite the fact that the parties' property was held in joint tenancy, "there was no intention by Plaintiff to create a one-half property interest in Defendant, nor any expectation by Defendant that he had received a one-half property interest." *Id.* The Utah Supreme Court upheld the district court's finding in light of the court's "wide discretion in the division of marital property." *Id.* In contrast, in *Bradford*, this court held that real property that a husband had conveyed to himself and his wife as joint tenants was marital property because the husband himself testified that he "intended at that time to give a one-half interest in the home to his wife" and nothing in the record indicated otherwise. *See Bradford*, 1999 UT App 373, ¶ 24.

¶29 In this case, Richard owned the property in question prior to the marriage but then conveyed it to himself and Danielle as joint tenants. At the divorce trial, Richard was asked why the house had been retitled jointly:

> Q. Okay. You heard [Danielle] testify that the Woodland Hills house was titled jointly. How did that occur?
>
> A. Ahhh, I believe it was several months after we were married she demanded that I put her name on the deed for the Woodland Hills house. She claimed that if I wouldn't do that she was going to leave me and leave the marriage.
>
> Q. So you acquiesced in that?
>
> A. I did.
>
> Q. Did you intend for your premarital contribution to be a gift to her?
>
> A. No, I didn't.
>
> . . .
>
> Q. Do you consider your premarital contribution [of the Woodland Hills house proceeds] to be a gift to [Danielle]?
>
> A. No, I don't.
>
> Q. Do you consider it a gift to the marriage?
>
> A. No.

¶30 The court explained in its ruling on Danielle's motion for new trial that "there was no evidence of intent by [Richard] to

change the nature of his separate property contributions to marital property" and that the court had therefore exercised its equitable discretion to award Richard his premarital property.[8] In light of Richard's testimony that he added Danielle's name to the deed for the property only because Danielle threatened to leave him if he did not and the lack of any additional evidence, apart from the transfer itself, indicating that Richard intended to make a gift of the property, we conclude that the district court did not exceed its discretion in determining that Richard's property retained its premarital character.

### III. Due Process

¶31 Finally, Danielle contends that she "was denied due process by [Richard's] misstatements to the court regarding financial matters, which resulted in [Danielle] having inadequate support to employ counsel" because the district court refused to release funds from the estate to her. She claims that this was a denial of due process and that the district court therefore should have granted her motion for new trial.

¶32 First, we are skeptical of Danielle's claim that the funds she had prior to trial were insufficient for her to hire legal counsel. Danielle concedes that in addition to her temporary alimony award,[9] the court released $10,000 to each party on two separate occasions. And the parties further stipulated to a release

---

8. Danielle was also awarded premarital assets in the amount of $8,482.

9. At the outset of the divorce proceedings, the commissioner made a temporary award of $3,915 per month, of which half was child support and half was alimony. In arriving at this amount, the commissioner imputed to Danielle an after-tax income of $1,850 per month.

of another $10,000 to each party. We also doubt Danielle's claim that she was utterly helpless in preparing for trial without an attorney, as she is herself an attorney, having both graduated from Stanford Law School and passed the Utah bar examination.

¶33    In any event, Danielle has failed to adequately brief this issue. *See* Utah R. App. P. 24(a)(8) ("The argument must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal."). She claims to have been denied due process but fails to discuss any legal standards regarding due process. Her argument appears to assume that she had a due process right to representation by counsel in the divorce proceedings, but she provides no legal support for that proposition. *See, e.g.*, *State v. Young*, 853 P.2d 327, 354 (Utah 1993) (noting that there is generally "no right to counsel in a civil case").[10] She also makes cursory reference to the "doctrine of unclean hands" but fails to discuss this doctrine or explain how it applies in the context of her due process argument. Instead of supporting her due process claim with reasoned legal analysis, Danielle peppers her brief with conclusory statements asserting that various actions by Richard and the court "denied her due process." The rest of her argument consists of a list of complaints regarding the limitations she faced in preparing her case without an attorney in light of her claimed disabilities.

¶34    Essentially, Danielle's argument asks us to hold that she was denied due process simply because she was not able to prepare her case in the manner that she would have preferred and because the court's rulings did not come out in her favor. This does not establish an adequate basis for a due process

---

10. We note that Danielle does not allege the court refused to allow her to be represented by counsel at her own expense. In such a case, our analysis would be different.

claim, and we therefore conclude that Danielle has failed to carry her burden of persuasion on this issue.[11]

CONCLUSION

¶35 The district court's factual findings supporting its imputation of income to Danielle and its assessment of her needs were supported by sufficient evidence and not clearly erroneous. Similarly, the court did not exceed its discretion by crediting Richard's testimony regarding his separate premarital property and awarding him a credit for the value of that property. Further, we reject Danielle's due process claims because she has failed to adequately brief them.[12] Accordingly, we affirm the

---

11. Danielle also includes three claims regarding the adequacy of the record in her briefing of this issue. In all three, she essentially argues that a new trial should be granted due to the district court's failure to record certain post-trial proceedings. We reject these claims because Danielle did not show "that the issue was preserved" or provide a "statement of grounds for seeking review of an issue not preserved." *See* Utah R. App. P. 24(a)(5). Moreover, as the appellant, Danielle bears the burden of establishing a record adequate to support her claims on appeal. *See, e.g.*, *Reperex, Inc. v. May's Custom Tile, Inc.*, 2012 UT App 287, ¶ 13, 292 P.3d 694; *see also* Utah R. App. P. 11(e)(2). This burden entails either providing a transcript of the relevant hearings or, where no transcript can be made, reconstructing the proceedings through the participants' affidavits. *See id.* R. 11(g); *see also* *Ajinwo v. Chileshe*, 2018 UT App 39, ¶ 3, 420 P.3d 51. Danielle has not done the latter, and thus unable to carry her burden on appeal of showing prejudicial error.

12. Danielle requests an award of fees on appeal. As she has not prevailed on appeal, we deny this request. *See Leppert v. Leppert*,

(continued…)

district court's findings and conclusions and its denial of Danielle's motion for new trial.[13]

———————

2009 UT App 10, ¶ 29, 200 P.3d 223. Also, Danielle is a pro se litigant and therefore not entitled to fees. *See White v. White*, 2017 UT App 140, ¶ 37, 402 P.3d 136.

13. To the extent that we have not addressed other points or subpoints raised in Danielle's briefs, we have determined that they lack merit and decline to separately analyze them. *See Lucas v. Wells Fargo Bank, NA*, 2013 UT App 117, ¶ 14 n.4, 302 P.3d 1240; *see also Centennial Pointe Owners' Ass'n v. Onyeabor*, 2009 UT App 325U, para. 1 n.1 (declining to address some of a pro se appellant's "inadequately briefed arguments"); *Delta Delta Delta v. Theta Phi House Corp.*, 2009 UT App 133U, para. 5 n.1 ("Other issues raised by [the appellant] are without merit, and we decline to analyze them in detail.").